## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

JOSEPH CLARK                                                         PLAINTIFF

v.                                  CASE NO. 4:09CV00851 BSM

O'REILLY AUTOMOTIVE, INC.                                    DEFENDANT

### ORDER

Defendant O'Reilly Automotive, Inc. ("O'Reilly") moves for summary judgment. [Doc. Nos. 22-24]. Plaintiff Joseph Clark objects, [Doc. Nos. 33-35] and O'Reilly has replied. [Doc. Nos. 40, 41]. For the reasons set forth below, O'Reilly's motion is granted.

### I. FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Clark, the nonmoving party, the uncontroverted facts are as follows. Clark is a fifty-one-year-old male who suffers from lupus, fibromyalgia, diabetes, and arthritis. His symptoms include light-sensitivity, frequent migraine headaches, difficulty sleeping, and joint, muscle, and bone pain. Additionally, he has undergone six hip replacement surgeries.

Clark began working as a part-time auto parts specialist at O'Reilly's Jacksonville, Arkansas retail store on June 9, 2008. This position was well-suited to Clark because it was a part-time position, he was not exposed to the elements, the job did not require particularly strenuous physical activity, and he was permitted to sit and take breaks as needed. During all relevant periods, Dave Gallentine was the Jacksonville store manager. As such, he supervised the retail-store staff, including Clark.

In Fall 2008, Clark began having problems with one of his co-workers, John Hanson, a twenty-nine-year-old male. Clark believed that Hanson's behavior made customers and co-workers uncomfortable. Specifically, Clark observed that Hanson would become angry with customers and make faces and interrupt them. When Clark tried to speak with Hanson about his concerns, Hanson told Clark he did not want to work with him because he was an "old cripple" and was "too old to be trained." Hanson made similar comments on other occasions.

It appears that Hanson was indeed a difficult coworker. Between September 30, 2008, and July 9, 2009, he received six write-ups for violations of company policy. Other Jacksonville employees confirm that Hanson was rude, lazy, difficult to work with, and on at least one occasion threatened to physically harm Clark.

Clark was also disciplined for inappropriate behavior. On October 27, 2008, he was written up for writing the word "shit" over someone's name on the work schedule. On another occasion, Clark was verbally disciplined when—in front of both co-workers and customers—he asked Gallentine, "Does John [Hanson] suck good d@*k or what?" Furthermore, on November 4, 2008, Clark was sent home for violating O'Reilly's appearance policy because his goatee had white and black stripes in it.

On November 5, 2008, Clark complained to O'Reilly's human resources department that Hanson threatened to beat him with a baseball bat, called him a "cripple" and "old man", talked on his cell phone in the store, left the back door open at night, counted money in the safe during business hours, and used his personal laptop in the store to display

2

pornographic images of his friend's wife. Clark also complained that he was sent home by Gallentine because of the appearance of his goatee. On November 7, 2008, Clark called O'Reilly's "T.I.P.S. Hotline," a mechanism whereby employees can report their grievances to a neutral third party, regarding his complaints against Hanson.

On November 10, 2008, O'Reilly district manager John McCoy traveled to the Jacksonville store and met with Gallentine and other Jacksonville employees regarding Clark's concerns about Hanson's behavior. Although McCoy was able to confirm that Hanson had indeed violated O'Reilly's company policy on several occasions, he was unable to verify Clark's allegations that Hanson threatened to physically harm him. Specifically, Gallentine provided a written statement to McCoy that indicated it was Clark, and not Hanson, who was the first aggressor. Gallentine's statement recounted that Clark often told Gallentine that he would "kick John Hanson's ass." McCoy's investigation also revealed that on at least one occasion, Clark came to work with a handgun stored in his car. Clark was issued a "first and final warning" because it is against O'Reilly's policy to possess firearms on company premises.

Because his visit was during the day, McCoy did not interview the employees who mainly worked at night. Several of those employees would have told McCoy that they overheard Hanson make menacing threats against Clark on multiple occasions and that Hanson initiated the hostilities between the two men.

Citing his belief that the two men "could not work together," Gallentine reduced the

3

number of overlapping shifts worked by Clark and Hanson. To accomplish this goal while staying within payroll guidelines, Gallentine alternately covered either Clark's or Hanson's shift when the two were scheduled to work together.  For this reason, the number of hours worked by both Clark and Hanson were proportionately reduced for several weeks. Because Gallentine was a salaried employee, no additional benefit inured to him for covering the extra shifts. Clark's and Hanson's regular schedules resumed shortly after they told Gallentine that they would find a way to work with each other.

On November 21, 2008, Clark again called the T.I.P.S. Hotline. During this call, Clark reported that he was being subjected to a hostile work environment, that his hours were cut after he complained to Gallentine, and that he was threatened with discipline or termination for making complaints. Clark also restated many of the complaints about Hanson made during his previous call. This second T.I.P.S. call was routed to McCoy and Gary Shelby, a regional manager for O'Reilly, for investigation.

On November 28, 2008, McCoy and Shelby traveled to the Jacksonville store and interviewed Clark, Hanson, Gallentine, and available employees. Clark was told to report to work that day to cover someone's shift and was unprepared for the meeting. When he was asked to prepare a written statement setting forth his allegations of harassment in precise detail (including the dates and times of Hanson's conduct), Clark was unable to do so even after several hours.

Hanson told McCoy and Shelby that his threat to strike Clark with a baseball bat was

4

made in jest.  Hanson explained that Clark jokingly asked Hanson to "slap him in the back if he messed up" and Hanson responded, "[w]y don't I use a bat?" Gallentine told McCoy and Shelby that this was likely true. Further, none of the employees interviewed reported that Hanson was harassing Clark. Clark vigorously contests this characterization and reiterates that because most of his shifts with Hanson were at night, McCoy and Shelby should have interviewed the Jacksonville employees who worked during the evening hours.

Following his investigation, Shelby discussed the possibility of transferring Clark to a different O'Reilly store given his poor relationship with Hanson. Clark told Shelby that although he was interested in such a transfer, he would need to consider the feasibility of a lengthier commute. No immediate decision was made as to the transfer.

On January 2, 2009, Clark contacted O'Reilly's human resources department to complain that Hanson was continuing to create a hostile work environment. This time, Clark complained that Hanson made false allegations of misconduct against him to Gallentine. Indeed, a few days earlier Clark received a written warning for sending an O'Reilly customer to a competitor for an automotive part. The write-up indicates that two employees informed Gallentine that Clark was sending customers elsewhere; it is not clear whether Hanson was one of the two.

Later in January 2009, a parts specialist position became available at the O'Reilly retail store in Gravel Ridge, Arkansas. The position was identical to Clark's position  at the Jacksonville store. McCoy told Clark he thought that the Gravel Ridge job would be a "fresh

start" and asked Clark if he would be interested in transferring. Upon finding that his commute would be only one-tenth of a mile farther than his commute to Jacksonville, Clark agreed to accept the transfer.

In April 2009, Clark filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that he was threatened by Hanson and an employee at the Gravel Ridge store because of his age and disability and was subjected to different terms and conditions of employment in retaliation for complaining about discrimination. This charge was never amended.

On July 17, 2009, Clark gave Chris Walker, manager at the Gravel Ridge store, a physician's note stating that Clark needed to be off work pending further notice. Because Clark was not eligible for leave under the Family and Medical Leave Act (FMLA), he was given fourteen days of leave per O'Reilly's "personal leave of absence" (PLA) policy. All O'Reilly employees who are ineligible for FMLA leave and who have worked for O'Reilly for at least six months may receive the benefit of this policy if facing illness or a family crisis. The maximum number of days an employee may use under the PLA policy is forty-two calendar days.

Upon receipt of the physician's note, O'Reilly provided Clark with fourteen days of leave under its PLA. Consequently, Clark was required to return to work on July 31, 2009. On July 27, 2009, Clark produced a second note from his physician stating that he could return to work, but only to "a sedentary position." Walker told Clark that although he

personally did not object to such restrictions, O'Reilly would not allow Clark to work in a sedentary position because the essential functions of his job required light physical exertion. On August 3, 2009, Clark delivered a third physician's note to O'Reilly's regional office in Little Rock stating that Clark could return to work with the assistance of crutches. It is undisputed that several O'Reilly employees at the Jacksonville and Gravel Ridge locations previously used crutches while at work. Clark, however, was terminated effective July 31, 2009, the day his fourteen days of PLA leave expired, because he failed to return to work.

In his amended complaint, Clark states the following causes of action: hostile work environment under the Age Discrimination in Employment Act (ADEA), the Americans with Disabilities Act (ADA), and the Arkansas Civil Rights Act (ACRA); disability discrimination under the ADA and ACRA; retaliation under the ADA and ACRA; and age discrimination under the ADEA. O'Reilly moves for summary judgment on the basis that Clark cannot produce competent proof of intentional discrimination.

## II. LEGAL STANDARD

Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Christoffersen v. Yellow Book U.S.A.*, 536 F.3d 947, 949 (8th Cir. 2008); Fed. R. Civ. P. 56.

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which

it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

Once the moving party demonstrates the absence of a genuine and material factual dispute, the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but its response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The plain language of Rule 56(c) mandates the entry of summary judgment against a nonmoving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322. Further, the nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in her favor on more than mere speculation, conjecture, or fantasy. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1985). A genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine. *RSBI*

8

*Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, all reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007). The evidence is not weighed, and no credibility determinations are made. *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

### III. DISCUSSION

As set forth below, summary judgment is granted as to all of Clark's claims. Because Clark's ability to meet the statutory definition of disability under federal and state law is a threshold requirement to his disability discrimination claims, that issue will be addressed at the outset. His individual claims will then be analyzed one at a time.

A.      Is Clark Disabled?

To recover under the ADA or ACRA, Clark must first show that he is disabled under those laws. The ADA's definition of disability covers three different sorts of individuals: (1) those with a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) those who have a record of such an impairment; and (3) those who are regarded as having such an impairment. *Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 459 (8th Cir. 2010). The ACRA, however, only protects individuals in the first category. *See Faulkner v. Ark. Children's Hospital*, 69 S.W.3d 393, 402 (Ark. 2002).

To qualify under the first definition, actual impairment, Clark must show (1) that he is "unable to perform a major life activity that the average person in the general population can perform," or (2) that he is "significantly restricted as to the condition, manner, or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Nyrop v. Independent School Dist. No. 11*, 616 F.3d 728, 733-34 (8th Cir. 2010). Major life activities include "'caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Id.* at 734 (quoting 29 C.F.R. § 1630.2(I)). The following three factors determine whether an individual is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. *Id.* (quotations omitted).

O'Reilly argues that Clark's ability to perform the necessary functions of his position undercuts his claim that he is substantially limited in performing major life activities. Clark responds that he was only able to perform his job at O'Reilly because it permitted short breaks when needed and he only worked part-time shifts. Given the substantial health problems attendant to Clark's lupus, there is certainly a fact issue as to whether Clark was significantly restricted in his ability to work as compared to an average person. Because Clark has introduced a genuine factual dispute as to actual impairment, it is not necessary

10

to address whether he had a "record of" impairment or whether he was "regarded as having" such an impairment.

B.    Hostile Work Environment

Clark's hostile work environment claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004). To make out a *prima facie* case, Clark must prove that (1) he is a member of a protected group (age or disability); (2) he was subjected to unwelcome harassment; (3) the harassment resulted from his membership in the protected class; (4) the harassment was severe enough to affect the terms, conditions, or privileges of his employment; and (5) that O'Reilly knew or should have known of the harassment and failed to take prompt and effective remedial action. *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006); *Shaver v. Independent Stave Co.*, 350 F.3d 716, 720 (8th Cir. 2003). Furthermore, for such harassment to be actionable, it must be both objectively and subjectively offensive. *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004). Therefore, in addition to establishing his own torment, Clark needs to show that, given the totality of the circumstances—including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with Clark's work performance—a reasonable person would find O'Reilly's workplace hostile or abusive. *Id.*

Given this stringent standard, Clark has not produced sufficient evidence to survive

summary judgment. First, O'Reilly's argument that the dispute between Clark and Hanson was generally unrelated to Clark's age or disability is well taken. Indeed, of all the complaints filed against Hanson with the T.I.P.S. hotline or O'Reilly's human resources department, only one alleged age- or disability-related animus. Second, although Hanson's statement that he would hit Clark with a baseball bat is physically threatening, the fact that Clark carried, and perhaps brandished, a handgun on company property mitigates the severity of Hanson's threat. Third, even if Clark could show that Hanson routinely called him names like "cripple" and "old man," it would not meet the rigorous standard for hostile work environment claims because simple teasing, offhand comments, and sporadic use of abusive language do not materially alter the terms and conditions of employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). For example, in *Peterson v. Scott County*, the Eighth Circuit held that a supervisor's regular references to "old ladies," refusal to allow the plaintiff to participate in a training session because it was "too hard to train old ladies," and a statement that plaintiff did not have "the right parts" to cover certain shifts were offensive but not actionable. 406 F.3d 515, 524 (8th Cir. 2005).

Based on the evidence in the record, no reasonable jury could find that O'Reilly's workplace was objectively offensive under the aforementioned standard. Therefore, summary judgment is appropriate on Clark's hostile work environment claims.

C.   Disability Discrimination

Both the ADA and ACRA prohibit discrimination against qualified individuals with

disabilities. 42 U.S.C. § 12112(a); Ark. Code Ann. § 16-123-107(a). ACRA disability discrimination claims are analyzed under the same principles as claims brought under the ADA. *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002). One important distinction regarding ACRA claims, however, is that there is no requirement that the plaintiff exhaust his administrative remedies with the Equal Employment Opportunity Commission (EEOC) prior to filing suit. *See* Ark. Code Ann. § 16-123-107(c)(3). Specifically, the plaintiff may bring suit under the ACRA within one year of the alleged discrimination, even if he did not file a charge with the EEOC. *See id.* This is particularly important in this case because Clark's sole EEOC charge, filed on April 9, 2009, alleged that the temporary reduction in hours, write-ups, transfer to Gravel Ridge, and Hanson's and Gallentine's conduct created a hostile work environment because of his age and disability and in retaliation for making complaints to human resources and the T.I.P.S. hotline.

As the Eighth Circuit noted in *Wedow v. City of Kansas City*, there is a narrow exception to the rule that a plaintiff must exhaust his administrative remedies for each discrete incident of discrimination prior to bringing a federal civil rights action. 442 F.3d 661, 673-74 (8th Cir. 2006). That exception allows a plaintiff to seek relief for subsequent acts of discrimination "like or reasonably related" to a previously filed EEOC charge. *Id.* at 673. Although a jury could find that Clark's failure-to-accommodate claim is reasonably related to his EEOC charge, Clark's claims for termination and retaliatory discharge are simply too attenuated from the allegations made in April 2009. Accordingly, Clark may

13

pursue his failure to accommodate claim under the ADA, but his termination and retaliation claims may proceed only under the ACRA.

### 1. Termination Under the ACRA

Because Clark did not produce direct evidence of disability discrimination, he must proceed under the *McDonnell Douglas* indirect method of proof. *Norman v. Union Pacific R.R. Co.*, 606 F.3d 455, 459 (8th Cir. 2010). To establish his *prima facie* case, Clark must show that (1) he is a disabled person within the meaning of the ADA, (2) he is qualified to perform the essential functions of the job (either with or without reasonable accommodation), and (3) he has suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises. *Price v. S–B Power Tool*, 75 F.3d 362, 365 (8th Cir. 1996).

As previously discussed, Clark has created triable issues of fact as to the first element. As to the second element, the undisputed facts show that Clark's position usually required only light to occasionally moderate levels of activity, that Clark had been successfully performing his job for over one year prior to his termination, and that several other O'Reilly employees had been allowed to work while using crutches. Accordingly, a reasonable jury could find that Clark was able to perform the essential functions of his job.

Finally, to complete his *prima facie* case, Clark must show that he was terminated under circumstances giving rise to an inference of unlawful discrimination. In Title VII cases, a plaintiff might satisfy this element with evidence that he was replaced by a

14

nonprotected individual. Under the law of this circuit, however, such proof is not a requisite part of the *prima face* case. *See Chock v. Northwest Airlines, Inc.*, 113 F.3d 861, 863 n.1 (8th Cir. 1997). Other circuits have extended this rule to ADA cases because, in most situations, the disability status of a replacement employee is unascertainable. *See, e.g., Ennis v. Nat'l Ass'n of Business and Educational Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995). Given the low threshold of proof needed to state a *prima facie* case, *see Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), a jury could find that the circumstances surrounding Clark's termination support an inference of unlawful discrimination.

O'Reilly, however, asserts that Clark's position terminated when he failed to return to work at the close of his PLA leave. Having produced a legitimate, nondiscriminatory reason for the adverse employment action, O'Reilly has dissolved the presumption of discrimination created by Clark's *prima facie* case. In order to prevail, Clark must now show that O'Reilly's proffered reason is merely pretextual.

To prove that O'Reilly's proferred reason for terminating him is pretextural, Clark maintains that (1) younger, nondisabled employees were allowed to work on crutches, (2) management allegedly condoned Hanson's discriminatory animus, (3) he was disciplined unfairly, (4) he was not given an adequate opportunity to clarify his claims against Hanson, and (5) O'Reilly mishandled the investigation of his complaints by not interviewing night-shift employees. All of these reasons might provide a basis for a finding of pretext under the right circumstances but they do not directly address the reason given by O'Reilly as to why

it terminated Clark. O'Reilly claims that it terminated Clark for failing to return to work after his PLA leave. To show that this is pretext, Clark should address whether other employees were terminated under similar circumstances. Rather, Clark explains why he believes O'Reilly discriminated against him. This is simply insufficient to show that O'Reilly's proffered reasons for terminating him were pretextual.

For these reasons, summary judgment is appropriate on Clark's claim that he was unlawfully terminated under the ACRA.

### 2. Retaliation Under the ACRA

Clark's ACRA retaliation claim is also subject to the *McDonnell Douglas* framework. *Burkhart v. Am. Railcar Indus., Inc.*, 603 F.3d 472, 476-77 (8th Cir. 2010). Clark must first make out a *prima facie* case by showing (1) he engaged in protected activity, (2) he suffered an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action. *Id.* at 477. By directing complaints to O'Reilly's human resources department about Hanson's inappropriate comments and filing his April 9, 2009, EEOC, Clark has engaged in protected activity. His termination as of July 31, 2009, is clearly an adverse action. Although the proof on causation is not particularly strong, whether there is a relationship between his complaints and termination is a fact issue that will ultimately turn on the credibility of the various persons involved with the decision. Accordingly, for the purposes of this motion, Clark has stated a *prima face* case.

In step two of the *McDonnell Douglas* framework, O'Reilly is called upon to produce

a legitimate, nondiscriminatory reason for Clark's termination. It has clearly done so by stating that Clark was terminated by failing to report to work at the end of his fourteen-day leave of absence. Because O'Reilly has met its burden of production, Clark must now show that the proffered reason is merely pretextual and that his termination was actually an act of reprisal for complaining about discrimination. Clark vigorously challenges O'Reilly's characterization that Hanson was an "equal-opportunity jerk" who did not get along well with many his co-workers and asserts that Hanson's discriminatory animus was directed solely upon him. This is not enough to introduce a genuine issue of fact as to pretext. Rather, Clark must produce evidence from which a reasonable jury could infer that O'Reilly's decision to terminate Clark was made in retaliation for his complaints against Hanson and his April 2009 EEOC charge. Because no such evidence lies in the record, summary judgment on Clark's retaliation claim under the ACRA is appropriate.

### 3. Failure to Accommodate Under the ADA and ACRA

As previously noted, because Clark's failure-to-accommodate claim is like or reasonably related to his April 9, 2009, EEOC charge, he is held to have exhausted his administrative remedies and may proceed under both the ADA and ACRA. Under those laws, an employer must provide an "otherwise qualified individual" who suffers from a physical limitation with a reasonable accommodation unless such accommodation would impose an undue burden. 42 U.S.C. § 12112(b)(5).

Clark requested leave on July 18, 2009. The physician's note he provided O'Reilly

17

stated that Clark could not work and that further evaluation of his condition was necessary.

On July 27, 2009, Clark presented O'Reilly with a second physician's note recommending

that Clark be restricted to a "sedentary work position only." Because the essential fucntions

of Clark's position required light to moderate physical activity, O'Reilly argues that such an

accommodation would not be reasonable. Under the applicable regulations, a reasonable

accommodation is defined as "[m]odifications or adjustments to the work environment, or

to the manner or circumstances under which the position held or desired is customarily

performed, that enable an individual with a disability who is qualified to perform the

essential functions of that position . . . ." 29 C.F.R. § 1630.2(o)(1)(ii). Clearly, allowing

Clark to perform his duties in a "sedentary work position only" would not be a reasonable

accommodation.

Clark's third physician's note, recommending that Clark return to work on crutches,

was produced to O'Reilly several days after his PLA leave expired. As O'Reilly submits, its

PLA leave policy is facially neutral. If an employee does not return at the end of his leave

period, his position is terminated. Because Clark's noncompliance with O'Reilly's PLA

policy is not related to his disability, O'Reilly was not required to grant an exception to its

neutral policy and keep open his position beyond fourteen days. *See Peebles v. Potter*, 354

F.3d 761, 768-69 (8th Cir. 2004). The question whether the use of crutches would be a

reasonable accommodation need not be reached because Clark was terminated prior to

tendering the third physician's note. Accordingly, summary judgment on Clark's failure-to-

accommodate claim is appropriate.

D.    Age Discrimination

Under the Age Discrimination in Employment Act of 1967 (ADEA), an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). Because no reasonable jury could find that Clark's termination claim under the ADEA is like or reasonably related to his April 9, 2009, EEOC charge, summary judgment on that claim is appropriate.

As to his reduction-in-hours and transfer claims, Clark has not produced any competent proof to genuinely dispute that his poor working relationship with Hanson was the reason for the temporary scheduling change and his transfer to the Gravel Ridge store. First, the shifts assigned to Hanson (who is significantly younger than forty) were reduced to the exact same extent as Clark's. Second, once Clark and Hanson informed Gallentine that they could peaceably work together again, their hours were restored immediately. As to the transfer, Clark's own subjective speculation that he was transferred because of his age is unsupported by the record. When O'Reilly noted that Clark's relationship with Hanson was not improving, Clark was offered the option of transferring to another store. After some reflection and determining that his commute would not increase, he voluntarily accepted the offer to transfer. Given the absence of evidence in the record capable of demonstrating O'Reilly's discriminatory intent, no reasonable jury could find that Clark's hours were

19

reduced or that he was transferred because of his age.

## IV. CONCLUSION

For the reasons set forth herein, O'Reilly's motion for summary judgment [Doc. Nos. 22-24] is granted and Clark's claims against O'Reilly's are dismissed with prejudice.

Dated this 23rd day of May, 2011.

_____
UNITED STATES DISTRICT JUDGE